## ACTION FOR RECOVERY OF MONEY PAID FOR CORPORATE STOCK.

Common Pleas Court of Cuyahoga County.

### J. C. DONNELL v. THE CONTINENTAL SUGAR COMPANY AND J. F. HARPER.*

Decided, May 18, 1914.

*False Representations—Not Ground for Recovery Back by a Purchaser of Corporate Stock—Unless the Representations Are Shown Have been False and to Have Induced the Purchase.*

An action does not lie for recovery back of the amount paid for corporate stock the purchase of which is alleged to have been induced by false representations, when the evidence shows that the representations related to the future policy of the company, and the purchaser knew that a large proportion of the new issue of stock had not been taken, and there is a failure to show by a preponderance of the evidence that he relied on the alleged false representations or was induced by them to subscribe for the stock, but on the contrary it appears that he was a man experienced in business matters, and had made an independent investigation of the affairs of the company issuing the stock, and that the mortgage which the company has been compelled to place on its property was made necessary by a disaster occurring subsequent to his subscription for stock.

*Cline, Clevenger, Buss & Holliday,* for plaintiff.
*Squire, Sanders & Dempsey,* contra.

ESTEP, J.

The plaintiff, in his petition, relies upon two grounds of false and fraudulent representations for the relief which he seeks in this action.

The first ground relates to the statement which he claims J. F. Harper, the president of the defendant company, made to the effect that of the increased stock enough had been subscribed to pay for the entire construction of the plant at Findlay, Ohio; that these subscriptions had been made by the Ameri-

---

*Affirmed by the Court of Appeals, November 16, 1914. Opinion by Grant, J.

can Sugar Company and by certain persons known as the Havermeyers, that the subscribers for the stock had contracted to fully pay the par value of said stock in installments, as rapidly as money was needed for the construction and completion of the Findlay plant.

It is not now claimed that any representations relating to the fact that the plant should be fully paid for, and the title thereto should be free from any mortgage lien or indebtedness whatsoever, are of any importance in this action. It is clearly the law that an agent of a corporation can not bind the corporation by any representations he might make as *to the future* financial policy of the corporation. That matter rests entirely in the hands of the directors of the corporation. It is also well settled law that a false representation must relate to a past or a present fact or condition, and not to some future event.

The second charge in the petition relates to the false and fraudulent representation claimed to have been made by defendant Harper, to the effect that he had persuaded said subscribers, the American Sugar Company and the Havermeyers, to relinquish their claims under their subscriptions to $30,000 or $40,000 of par value of said stock, for the purpose of selling and distributing the same among the residents of Findlay, Ohio. It is claimed in his petition that the plaintiff also relied upon this false and fraudulent representation in making the purchase of his one hundred shares of stock, and that it was one of the inducing causes of his said purchase.

It is not claimed by the plaintiff that it was represented that all of the $1,000,000 additional stock had been subscribed for, but that only enough had been subscribed for to build the Findlay plant. In other words, the plaintiff knew that a large portion of the increased stock was in the treasury of the company.

Counsel for plaintiff, in his closing argument, only claims for this representation that it was a bait held out to the plaintiff by Harper for the purpose of creating in him a desire to possess some of this stock.

I can hardly come to the conclusion, considering the business experience of the plaintiff, and the fact that he knew all the increased stock had not been subscribed for, that he could have placed any reliance in any statement Harper may have made

to the effect that he was securing releases from other sub-
scribers in order to let the Findlay people have any of this
increased stock, or that this statement was an inducing cause
for his purchase. There is some testimony which tends to show
that Harper referred to the stock to be taken by the Findlay
people as an "allotment" of stock. In the letter written by
Harper to D. Kirk, Jr., a prospective subscriber, he refers to
the fact that he would like Kirk, Jr., to subscribe, "provided it
comes within the allotment which we named to Mr. Jones,
namely, $50,000."

There is also some testimony tending to show that the plaint-
iff had some knowledge as to the investigation of the Ameri-
can Sugar Company by the government, and that it was a ques-
tion as to whether or not the American Sugar Company could
subscribe for any of this stock.

Taking all the evidence into consideration relating to this
alleged representation, I am of the opinion that the plaintiff,.
even if it was made, was not deceived by it, and did not rely
on it in making his purchase of the stock in question.

In order to recover in a case of this character, the plaintiff
must not only show that the false and fraudulent representation
was made, but that he relied upon it, and that it was the induc-
ing cause for his purchase of this stock. The law relating to
the question of reliance is well stated in Kerr on Fraud, page
945, as follows:

"If a man to whom a representation has been made knows at
the time or discovers before entering into a transaction that
the representation is false, *or resorts to oher means of knowl-
edge open to him,* and chooses to judge for himself in the matter,
he can not avail himself of the fact that there has been mis-
representation, or say that he has acted on the faith of the rep-
resentation."

Conceding, therefore, that the representation relating to the
fact that enough of the increased stock had been subscribed for
to build the plant at Findlay, was made, and that this repre-
sentation was false, has the plaintiff shown by a preponderance
of the evidence that he relied upon this statement, and that it
was the inducing cause of his purchase of the stock in question?
In answering this question, as to whether or not plaintiff relied

upon the misrepresentation, it becomes necessary at the outset to consider who the plaintiff in this action is.

J. C. Donnell was a man of unquestioned business experience. He was president of the First National Bank, at Findlay, Ohio; he was the owner of a business block, which he rented, and was also the owner of a seven hundred acre farm, near Findlay, which he successfully farmed; he was also the president of the Ohio Oil Company, one of the large properties controlled by the Standard Oil Company. As stated by counsel for defendants, he was no child, but, on the contrary, was a man of large business affairs, accustomed to large transactions of a financial character, and appears to be fully capable of taking care of himself in a business transaction.

The new plant of the defendant company was under construction at Findlay in the summer of 1911. It was a large plant, estimated at that time to cost $750,000, and which finally cost $800,000 to $900,000; the company at that time had outstanding stock in the sum of $1,200,000, and had been successfully operated for about four years; it had paid 8% annually to its stockholders, and had accumulated a surplus of between $300,000 and $400,000; the outlook for the coming year for the sugar beet business was fine, and was exceptionally so by reason of the failure of the sugar beet crop abroad. The condition, financially, of the company at the time of the negotiations in relation to this stock was good. The company, by reason of the building of the new plant at Findlay, and the outlook of increased business, increased its capital stock to $2,500,000. Of this increase, a stock dividend of 25% to its stockholders was made, thus increasing its outstanding stock to $1,500,000, leaving $1,000,000 in its treasury.

These facts, I believe, from all the evidence in the case, can fairly be said to have been within the knowledge of the plaintiff at the time he subscribed for this stock, to-wit, September 13, 1911.

The talk with Mr. J. F. Harper at the golf grounds took place the latter part of August or early in September, and at its close the plaintiff said he would consider taking a little of the stock.

After this conversation Harper left Findlay and did not return until some time later, and after September 13, 1911.

On September 8th, at the request of plaintiff, the defendant Harper mailed him a financial statement of the company of date of March 1st, 1911, which so far as the testimony shows, *was true in all respects.* Mr. Jones, the cashier of the First National Bank, had received reports from mercantile agencies and from Fremont bankers as to the financial standing of the company. These inquiries were made largely on account of the fact that the defendant company carried an account at the bank. The plaintiff, being president of this bank, it can fairly be assumed that he knew something in regard to the investigation made in regard to the financial standing of the defendant company, particularly in view of the fact that the plaintiff and Jones were contemplating purchasing stock of said company. There is nothing strange in regard to these investigations, as the plaintiff, being a good business man, was naturally interested in ascertaining the financial condition of the company *prior to the purchase of the stock.* These reports and investigations were found to be satisfactory, and I am of the opinion that until late in October of 1911 the financial condition of the company was good, and the outlook for a prosperous year was all that could be desired.

In addition to all this, the city of Findlay, a place of about 15,000 inhabitants, was obtaining this large plant, which must necessarily have been a matter of pride to its citizens, and naturally would create a desire in the minds of its leading citizens to become to some extent financially interested in this plant

It also appears from the testimony that the First National Bank owned or controlled a large area of sugar beet lands in this territory. If this is true, and Jones, the cashier, says it is, then this would be an additional motive to induce plaintiff to become a stockholder.

From all that I have said, can it be declared, by the preponderance of the evidence, that this stock was purchased by the plaintiff upon reliance in the statement made by the defendant Harper, that enough of the increased stock had been sold to pay for the Findlay plant? Isn't it more probable that the plaintiff, in the purchase of this stock, *relied* upon investigations made on his own account; upon his knowledge of the financial condition

of the company and its future outlook on September 13, 1911; his interest in sugar beet lands in the Findlay territory, and also his pride, as one of the leading citizens of Findlay, in having this large and expensive plant located in his home city? It appears to me that it is fair to conclude from all the testimony in this case that these things are the matters which primarily controlled and induced this experienced business man to purchase this stock.

In the spring of 1912, during the month of April, the company decided to place a mortgage of $1,200,000 upon all its property, including the plant at Findlay. When plaintiff was advised of this action he at once tendered his stock to the company and demanded the return of his money. If it had not been for the placing of this mortgage upon the property, this law-suit would not have been filed. It is clear that in September, 1911, this mortgage was not in the contemplation of any person connected with the defendant company, as its financial condition and the outlook were good, and its stock was apparently a good investment. Unfortunately, in the latter part of October, 1911, heavy rains set in, and were of such long continuance that the sugar beet crop was practically ruined. The company owed the farmers about $1,000,000. The loss by way of the poor beat crop amounted to about $400,000. The result of all this compelled the directors, in order to tide over the company, to place this large mortgage upon its property.

This disaster had to be met in the only possible way, and as there is nothing to show that the matter was even in the contemplation of Harper at the time of the sale of this stock, I fail to see how it can be now urged, as a reason why the stock—which when the plaintiff purchased it was surely worth par—should be canceled and his money restored to him.

I am of the opinion, considering all the testimony in the case, that plaintiff should not recover, and his petition is therefore dismissed.